AO 106 (Rev. 04/010) Application for Search Warrant          AUTHORIZED AND APPROVED/DATE:      s./ Tiffany Noble

# UNITED STATES DISTRICT COURT

for the

_____WESTERN_____ DISTRICT OF _____OKLAHOMA_____

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| **Black Cricket Cellular Phone** seized on January | ) |
| 24, 2022 by and at a premises under the control | ) |
| of the FBI Oklahoma City Field Office | ) |

Case No: MJ-22-122-STE

## APPLICATION FOR SEARCH WARRANT

I, a federal law enforcement officer or attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following Property:

See Attachment A, which is attached and incorporated by reference.

Located in the Western District of Oklahoma, there is now concealed:

See Attachment B, which is attached and incorporated by reference.

The basis for the search under Fed. R. Crim.P.41(c) is:
- ☒ evidence of the crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 113(a)(3) & 1153, & 5032 | Assault with a Dangerous Weapon (Act of Juvenile Delinquency) |

The application is based on these facts:

See attached Affidavit of Special Agent_____, Federal Bureau of Investigation, which is incorporated by reference herein.

- ☒ Continued on the attached sheet(s).
- ☐ Delayed notice of ____ days is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet(s).

_____
*Applicant's signature*

CHARLES THUMANN, Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my presence.

Date: _____**Feb 18, 2022**_____

_____
*Judge's signature*

City and State:  Oklahoma City, Oklahoma

SHON T. ERWIN, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Charles W. Thumann, a Special Agent of the Federal Bureau of Investigation (FBI), Oklahoma City Division, being duly sworn, state:

### AFFIANT'S EXPERIENCE

1.     I have been employed as a Special Agent with the FBI since July 2004 and have been assigned to the Oklahoma City Division of the FBI for approximately 11 years. During the past 17 years, I have conducted a wide variety of investigations, including cases involving violent crimes in Indian country.

### PURPOSE OF AFFIDAVIT

2.     I have probable cause to believe that contraband and evidence of a crime, fruits of a crime, and instrumentalities of an act of juvenile delinquency, to wit: Assault with a Dangerous Weapon, which would have been a crime in violation of Title 18, United States Code, Sections 113(a)(3) and 1153 if committed by an adult, in violation of Title 18, United States Code, Section 5032, are contained in the Cricket smartphone (hereinafter referred to as "the **SUBJECT PHONE**"). The **SUBJECT PHONE** was seized on January 24, 2022, pursuant to a federal search warrant.  The **SUBJECT PHONE** is currently located in the Western District of Oklahoma, in the Evidence Control Room at the FBI Oklahoma City Field Office in Oklahoma City, Oklahoma.  The **SUBJECT PHONE** is described in detail in Attachment A to this affidavit. I request a warrant to search the

**SUBJECT PHONE** for the items specified in Attachment B hereto, which constitute instrumentalities, fruits, and evidence of said act of juvenile delinquency.

3.     This investigation, described more fully below, has revealed that an individual knowingly utilized and accessed the **SUBJECT PHONE** to discuss the violation of the foregoing statute, and that there is probable cause to believe that evidence, fruits, and instrumentalities of such violations are located on the **SUBJECT PHONE**.

4.     The information contained in this affidavit is based upon my personal knowledge and observation, my training and experience, conversations with other law enforcement officers and witnesses, and review of documents and records.

5.     Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.   I have set forth only the facts that I believe are necessary to establish probable cause to support the issuance of a search warrant.

## FACTS AND CIRCUMSTANCES

6.     On January 23, 2022, at approximately 10:23 p.m., Pottawatomie County 911 Center received a distress call from a female reporting she shot her father at 29223 Sunshine Drive, Tecumseh, Oklahoma 74873. The reporting party identified herself as K.J.L.A. and stated, "I shot my dad." K.J.L.A. reported her father, John, was laying on the bedroom floor and was still breathing. During the 911 call, K.J.L.A. confirmed she shot her father at close range with a 20-gauge shotgun. K.J.L.A. told the 911 Center operator

she still had the shotgun in her possession. K.J.L.A. was instructed by the 911 Center operator to unload the gun and put it away.

7.      On January 24, 2022, one of the officers from the Absentee Shawnee Tribal (AST) Police Department who responded to 29223 Sunshine Drive, Tecumseh, Oklahoma 74873 was interviewed by the FBI. The officer stated John was shot by his daughter K.J.L.A. while he sat on the couch in the living room of the residence. The responding officer recalled John suffered a gunshot wound to the left side of his abdomen. The responding officers provided medical care until paramedics arrived. John was transported to the Pink Fire Department and then air lifted to OU Medical Center in Oklahoma City, Oklahoma.

8.      John was the sole guardian for K.J.L.A. at the 29223 Sunshine Drive, Tecumseh, Oklahoma 74873. John divorced K.J.L.A.'s stepmother Teresa a few years ago. According to AST Police, Teresa does not have any custodial rights to K.J.L.A. K.J.L.A.'s biological mother does not have a relationship with K.J.L.A. and K.J.L.A. could not provide any information as to her biological mother's whereabouts.

9.      On January 24, 2022, law enforcement interviewed K.J.L.A. at the Absentee Shawnee Tribe Police Department Substation located 15702 East Highway 9, Norman, Oklahoma 73026. K.J.L.A. was provided a copy of her Advice of Rights (Miranda). Law enforcement read aloud the Advice of Rights while K.J.L.A. read along. K.J.L.A. agreed to speak with law enforcement and signed the Advice of Rights form. The interview was audio recorded.

2

10.     K.J.L.A. is currently a 10th grade student at Little Axe High School. This school year, K.J.L.A. transferred from Macomb Schools because she got into trouble for vaping at school. K.J.L.A. did not report any learning disorders and was able to talk about extra-curricular activities in which she participates. K.J.L.A. did not appear to be under the influence of drugs. K.J.L.A. appeared to answer the questions by law enforcement in a clear and logical manner. K.J.L.A. reported she suffers from and is prescribed medication for depression. K.J.L.A. did not appear to be suffering from any mental health conditions that would prevent her from being able to understand the nature of the circumstances.

11.     K.J.L.A. stated she, her younger brother, S.L., and her father, John had all lived at 29223 Sunshine Drive, Tecumseh, Oklahoma 74873 for approximately two years. Previously, K.J.L.A. was in foster care for two years.

12.     On the evening of January 23, 2022, John asked K.J.L.A. to go to the store. K.J.L.A. told John she could not go to the store because there was no gas in the car. K.J.L.A. admitted there should have been half a tank of gas but she had driven to one of her friends' residences several times over the past few days. John was upset because there was no gas and asked K.J.L.A. where she had been. K.J.L.A. refused to answer and walked away toward her bedroom. This upset John and he followed K.J.L.A. to her bedroom and proceeded to physically strike her with an open fist to the side of her face and punched her in the chest, which knocked her to the floor. John then left K.J.L.A.'s bedroom and went back to the living room.

13.     K.J.L.A. had a shotgun in her bedroom which she kept next to her door. K.J.L.A. maintained the ammunition in another location so her younger siblings would not

be able to shoot the gun. After her father left her room, K.J.L.A. loaded a shotgun shell into the single-shot shotgun, went to the living room, and shot John in his side as he sat on the couch. After K.J.L.A. shot John, she stated John got up and ran at her. K.J.L.A. went back to her bedroom to grab another shell and reload her shotgun. John stated, "Please don't shoot me again. It hurts." Following the gun shot, S.L. came from his bedroom into the kitchen of the residence. K.J.L.A. decided not to shoot John again because she did not want S.L. to see that.

14.    K.J.L.A. explained the reason she shot John was because she was tired of being hit. K.J.L.A. was hit growing up in the family home and stated both John and her stepmother physically abused her. K.J.L.A. indicated John may have touched her in a sexual manner but refused to speak about details of that abuse during her interview with law enforcement. Law enforcement asked K.J.L.A. if she was scared of John. K.J.L.A. replied, "He terrifies me."

15.    Following the shooting, K.J.L.A. texted and called her friend J.H. from the **SUBJECT PHONE**. The friend told K.J.L.A. to call 911. K.J.L.A. estimated it was approximately 20 minutes between the time she shot her father and called 911. K.J.L.A. stated she left the **SUBJECT PHONE** in their bedroom of the residence.

16.    John Little Axe and K.J.L.A. are both enrolled tribal members of the Absentee Shawnee Tribe, a federally-recognized tribe, and are American Indian within the meaning of federal law. The home where the assault occurred is within the Western District of Oklahoma and within the boundaries of the family allotment of land held in trust by the Absentee Shawnee Tribe, which qualifies as Indian country under 18 U.S.C. § 1151.

4

17.     On January 24, 2022, the FBI executed a federal search warrant at 29223 Sunshine Drive, Tecumseh, Oklahoma 74873. During the search of the residence, the **SUBJECT PHONE** was seized from K.J.L.A.'s bedroom. The **SUBJECT PHONE** was found plugged into a charging cable next to the bedroom wall as K.J.L.A. described to law enforcement. The **SUBJECT PHONE** was the only smartphone seized from the residence. The FBI Evidence Response Team described the **SUBJECT PHONE** in the FD-886 Evidence Collected Item Log as a "Black Cricket Cell Phone".

18.     On January 31, 2022, J.H. was interviewed by law enforcement. J.H. corroborated some of the statements made by K.J.L.A. J.H. stated he exchanged Snapchat messages with K.J.L.A and spoke with her on the phone. on the **SUBJECT PHONE** the night of January 23, 2022, and allowed law enforcement to take photographs of the Snapchat messages. Below is a portion of their Snapchat messages:

| | | |
|---|---|---|
| <u>9:13 P.M.</u> | K.J.L.A.: | I'm sorry can you roll on up for me im really shaken up |
| <u>9:14 P.M.</u> | J.H.: | Hurry and I'll Decide |
| | K.J.L.A.: | Ok ok |
| <u>9:22 P.M.</u> | J.H.: | You on the way |
| | K.J.L.A.: | No I think I'm not |
| | J.H.: | Why |
| | | Are you coming or not |
| <u>9:23 P.M.</u> | K.J.L.A.: | No not right now maybe in like an hour |
| | | You can go to sleep |
| | | Actually I need to call |
| | J.H.: | Ok call then |
| | K.J.L.A.: | Can we in a minute |
| | | Hang on |
| <u>9:24 P.M.</u> | J.H.: | Make your mind up please |
| | | Love ya |
| | | When can I expect to be called |
| <u>9:28 P.M.</u> | K.J.L.A.: | Hang in I'm looking for something |

| | | |
|---|---|---|
| 9:29 P.M. | J.H.: | Oh Ok |
| | | Ok |
| 9:38 P.M. | K.J.L.A.: | Baby |
| | J.H.: | Yes |
| | K.J.L.A.: | I'm scared I'm really scared |
| | J.H.: | Ask the question and why |
| 9:39 P.M. | K.J.L.A.: | No cops promise |
| | J.H.: | What |
| | K.J.L.A.: | I'm in trouble |
| | J.H.: | How |
| | K.J.L.A.: | My dad attacked me |
| | J.H.: | wtf do you mean |
| | K.J.L.A.: | Baby |
| | | I freaked out |
| 9:40 P.M. | J.H.: | Nah they ain't gonna be a cop I'm finna head there and pop a cap |
| | K.J.L.A.: | I already did |
| | | He hit me |
| | | And I just didn't stop and think |
| | | Baby I need help idk slayer didn't see it he's gonna say I'm crazy |
| | J.H.: | So where your dad |
| | K.J.L.A.: | Baby I'm gonna calL the cops but ik how it's gonna turn out so I wanna see you one last time before I do |
| | J.H.: | Is he dead |
| | K.J.L.A.: | Baby I'm scared |
| | J.H.: | Answer the question |
| 9:42 P.M. | K.J.L.A.: | I shot him |
| | | With the shot gun |
| | | In my room |
| | | I'm shaking baby |
| | | Slayer said he didn't attack me |
| | | I'm gonna go to jail |
| | | He's almost dead |
| | | He's already dead |
| | | I can't tell slayer thag |
| | | That |
| | | I can't leave slayer |
| | | Silence |
| | | Baby baby wait don't come yet |
| | | I want him to die |
| | | He hit me |

|          |          | Wait till he die so you can't get blamed |
|----------|----------|------|
|          |          | I'll take whatever fall there is |
|          |          | But he hit me |
|          |          | I can't let him Walk away |
|          |          | So wait |
|          | J.H.:    | Where did you hit him |
| 9:48 P.M. | K.J.L.A.: | Until he stops breathing but don't hang up |
|          |          | In his stomach |
|          |          | Side |
|          |          | Right dead on |
|          |          | I'm scared slayer is going to run |
|          |          | Baby you said you would kill someone for me |
|          |          | I can come get you |
|          |          | He's laying on the floor |
|          |          | I'm gonna call them in the morning |
|          |          | Baby baby |
|          |          | No wait |
|          |          | Listen ik how it's going to play out |
|          |          | I'm gonna be the bad guy |
|          |          | Baby |
|          |          | Stop |
|          |          | Stop talking to your mom |
|          |          | Slayer didn't see it panther is not here |
|          |          | Ok fine I'm calling them |
|          |          | Ok ok |
|          |          | Don't hang up baby |
|          |          | Baby |
|          |          | Omg |
|          |          | I got his phone |
|          |          | Yeah |
|          |          | Okay |
|          |          | I don't wanna go to jail baby |
|          |          | I gave him melatonin |
|          |          | And told him to go to sleep that I was calling for help |
|          |          | He said I shot him for no reason |
|          |          | That's why I'm freaking out |
|          |          | He didn't see my dad hit me |
|          |          | Baby |
|          |          | I'm scared |
|          |          | I'm shaking |
|          |          | I called |
|          |          | I promise |

7

|  |  |  |
|---|---|---|
|  |  | Baby |
|  | J.H.: | Yes |
|  | K.J.L.A.: | I need to tell you everything that happen okay |
| 10:00 P.M. | J.H.: | Start |
| 10:01 P.M. | K.J.L.A.: | Slayer is going to say I shot him and I did I was in my room and my dad came in mad he was yelling at me |
|  |  | And then hit me in my stomach |
|  |  | I stopped for a second and realized what he did and he was still yelling at me and then crawled to the door where the gun is and got the bullet and shot him. |
|  |  | Slayer ran in there and my dad started saying why did shoit him that he was sorry and I just stood there |
|  |  | Baby |
|  |  | I'm scared |
|  | J.H.: | Ik ik |
| 10:04 P.M. | K.J.L.A.: | I didn't know what to do so I held slayer at gun point my dad was still up |
|  |  | He was running for me so I reloaded the gun |
|  |  | But he stopped when I said I was gonna shoot him again |
|  |  | I told him I was sorry be he wasn't gonna get away with it this time |
|  |  | I'm not a little girl anymore |
| 10:05 P.M. | J.H.: | You called |
|  | K.J.L.A.: | Baby |
|  |  | Talk to me |
|  |  | I'm scared |
| 10:06 P.M. | J.H.: | I don't know what to say |
|  |  | I just don't |
|  | K.J.L.A.: | Baby can I see you |
|  |  | Before they get here |
| 10:07 P.M. | J.H.: | You can't leave I'm sorry it'll will get you trouble and me |
|  | K.J.L.A.: | What do I tell them when the cops gets here |
|  | J.H.: | Tell them what you told me exactly |
| 10:08 P.M. | K.J.L.A.: | What about slayer |
|  | J.H.: | Idk |
|  | K.J.L.A.: | Will they believe him over me |
|  | J.H.: | You just gotta be truthful |
|  | K.J.L.A.: | Where are you |

|            | J.H.:      | Did you call promise |
|------------|------------|----------------------|
| 10:09 P.M. | K.J.L.A.:  | Yes |
|            | J.H.:      | You can't leave Kaylee I'm close enough. |
|            | K.J.L.A.:  | Omg |
|            |            | He's not breathing |
|            |            | Wait |
|            |            | Yes he is |
|            |            | Where am I gonna go |
|            |            | What's gonna happen to me |
| 10:10 P.M. | J.H.:      | Idk |
|            |            | Until they figure it out idk |
| 10:11 P.M. | K.J.L.A.:  | Baby |
|            |            | I'm crying |
|            |            | I knew he was gonna do it |
|            |            | I can't believe I shot him |
| 10:12 P.M. | J.H.:      | You did what you had to do |
|            | K.J.L.A.:  | I'm a horrible person |
|            |            | Maybe I deserve to go to jail |
| 10:13 P.M. | J.H.:      | Why if you did what you had to do |
|            |            | Are they there |
|            | K.J.L.A.:  | No |
|            |            | I think I hear them |
|            |            | My ears are ringing |
|            | J.H.:      | Go check |
| 10:14 P.M. | K.J.L.A.:  | What if he gets up |
|            |            | He already almost did like 20 minutes ago |
|            |            | I'm afraid he's gonna get up |
|            |            | I can't leave the room |
|            |            | I told slayer I wasn't gonna shoot him again but if he gets up I will |
|            |            | Isc |
|            |            | Idc |
| 10:15 P.M. | J.H.:      | Go check |
|            | K.J.L.A.:  | Where are u |
|            | J.H.:      | I'm close enough |
|            |            | I shouldn't get and closer than I am |
|            | K.J.L.A.:  | I'm sorry baby |
|            | J.H.:      | Don't be sorry you did what had to be done |
|            |            | Who did you call tribal police or just 911 |
|            | K.J.L.A.:  | Tribal I said they need to come now and he said their on their way and that's they was calling for help |
|            |            | But they don't really come out in the valley |

9

|          | J.H.:     | What did you tell them |
|----------|-----------|------------------------|
| 10:18 P.M. | K.J.L.A.: | That I shot my dad |
|          | J.H.:     | I'm gonna call they would have been here already |
|          |           | Ok |
|          | K.J.L.A.: | Ok |
|          |           | What did they say |
|          | J.H.:     | We're on the phone still |
|          | K.J.L.A.: | There coming |
|          | J.H.:     | They are there |
|          |           | ?? |
|          |           | ?? |
|          |           | Kay |
|          | K.J.L.A.: | H |
|          |           | They are talking to me |
|          | J.H.:     | Ok |
|          |           | What did they say what are they doing |
| 10:30 P.M. | K.J.L.A.: | Can I tell them your name |
|          | J.H.:     | yeah |

## TERMS

19.     Based on my training and experience, I use the following technical terms and definitions:

a.      "Computer," as used broadly herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones. See 18 U.S.C. § 1030(e)(1).

b.      A provider of "Electronic Communication Service" ("ESP"), as defined in 18 U.S.C. § 2510(15), is any service that provides to users thereof the ability to send or receive wire or electronic communications. For example, "telephone companies and electronic mail companies" generally act as providers of

10

electronic communication services. See S. Rep. No. 99-541 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3568.

     c.     "Short Message Service" ("SMS"), as used herein, is a service used to send text messages to mobile phones. SMS is also often referred to as texting, sending text messages or text messaging. The service allows for short text messages to be sent from one cell phone to another cell phone or from the Web to another cell phone.

     d.     "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer to access the Internet. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. An IP address looks like a series of four numbers, each in the range of 0-255, separated by periods (e.g., 121.56.97.178).

     e.     "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

11

f.      "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

g.      "Remote Computing Service" ("RCS"), as defined in Title 18, United States Code, Section 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

## SPECIFICS OF SEARCH AND SEIZURE OF CELL PHONES

20.     Searches and seizures of evidence from smartphones commonly require agents to download or copy information from the smartphones and its components, such as a flash drive or other digital storage units attached to the phone, to be processed later by a qualified computer expert in a laboratory or other controlled environment.  This is almost always true for the following two reasons:

a.      Smartphone devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others) can store the equivalent of thousands of pages of information.  Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all of the stored data that is available in order to determine whether it is included in the warrant that authorizes the search. This sorting process can take days or weeks, depending on the volume of data stored, and is generally difficult to accomplish on-site.

b.      Searching smartphones for criminal evidence is a highly technical

12

process requiring expert skill and a properly controlled environment. The vast array of smartphone hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a smartphone system is an exacting scientific procedure that is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since smartphone evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

21.     In order to fully retrieve data from a smartphone system, the analyst needs all magnetic storage devices as well as the central processing unit ("CPU"). In cases involving child exploitation where the evidence frequently includes graphics files, the monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues. In addition, the analyst needs all of the system software (operating systems or interfaces, and hardware drivers) and any application software which may have been used to create the data (whether stored on hard drives or on external media).

22.     Furthermore, because there is probable cause to believe that the smartphone and its storage devices are all instrumentalities of crimes they should all be seized as such.

## SEARCH METHODOLOGY TO BE EMPLOYED REGARDING ELECTRONIC DATA

23.     The search procedure for electronic data contained in smartphone hardware, smartphone software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

      a.     on-site triage of smartphone systems to determine what, if any, storage devices or digital storage units have been connected to such smartphone systems, a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or potential victims, and a scan for encryption software;

      b.     on-site forensic imaging of any computers that may be partially or fully encrypted, in order to preserve unencrypted electronic data that may, if not immediately imaged on-scene, become encrypted and accordingly unavailable for examination; such imaging may require several hours to complete and require law enforcement agents to secure the search scene until that imaging can be completed;

      c.     examination of all of the data contained in such smartphone hardware, smartphone software, or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

      d.     searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1)

an instrumentality of the offense, (2) a fruit of the criminal activity, (3) contraband,

(4) otherwise unlawfully possessed, or (5) evidence of the offense specified above);

     e.     surveying various file directories and the individual files they contain;

     f.     opening files in order to determine their contents;

     g.     scanning storage areas;

     h.     performing key word searches through all electronic storage areas to

determine whether occurrences of language contained in such storage areas exist

that are likely to appear in the evidence described in Attachment B; and

     i.     performing any other data analysis technique that may be necessary

to locate and retrieve the evidence described in Attachment B.

## **CONCLUSION**

24.     Based on the above information, there is probable cause to believe that the

foregoing laws have been violated, and that the following property, evidence, fruits, and

instrumentalities of these offenses are located on the SUBJECT PHONE.

25.     Based upon the foregoing, I respectfully request that this Court issue a

search warrant for the **SUBJECT PHONE**, described in Attachment A, authorizing the

seizure of the items described in Attachment B to this affidavit

Further Your Affiant sayeth not.

Charles W. Thumann
Special Agent
Federal Bureau of Investigation

15

Subscribed and sworn to before me this the _____18th_____ day of February, 2022, at Oklahoma City, Oklahoma.

SHON T. ERWIN
United States Magistrate Judge

16

## ATTACHMENT "A"

## DESCRIPTION OF THE SUBJECT PHONE

The property to be searched is a Black Cricket Cell Phone seized by the FBI on January 24, 2022, from 29233 Sunshine Drive, Tecumseh, Oklahoma 74873, hereinafter the "**SUBJECT PHONE**."  The **SUBJECT PHONE** is currently located in the Western District of Oklahoma, in the Evidence Control Room at the FBI Oklahoma City Field Office in Oklahoma City, Oklahoma. This warrant authorizes the forensic examination of the **SUBJECT PHONE** for the purpose of identifying the electronically stored information described in Attachment "B".

## ATTACHMENT "B"

## <u>LIST OF ITEMS TO BE SEIZED</u>

1.      All records on the **SUBJECT PHONE** described in Attachment "A" that relate to act of juvenile delinquency, to wit: Assault with a Dangerous Weapon by shooting John Little Axe in his abdominal area with a shotgun, with the intent to do bodily harm, which would have been a crime in violation of Title 18, United States Code, Sections 113(a)(3) and 1153 if she had been an adult, in violation of Title 18, United States Code, Section 5032:

     a.      any and all records related to the assault committed on January 23, 2022;

     b.      contact information of individuals identified as having communicated with K.J.L.A. regarding her relationship with the victim and/or her plan to or reactions from assaulting the victim on January 23, 2022;

     c.      any records regarding K.J.L.A.'s location data beginning January 23, 2022, until January 24, 2022;

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

As used above, the terms "records" and "information" include all foregoing items of evidence in whatever form and by whatever means they may have been created.